UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM BURRUSS, CHUCK CANADA, PAUL CASTELLANO, JOE CEDENO, LYONELL DAVIS, SAMUEL DIAZ, JR., RICHARD FEDDOR, GREG HAYES, THOMAS IACOVETTI, MYRON JONES, LARRY KOWALUK, NELSON LEWIS, ANTHONY LORDO, RICHARD MESSINA, JOHN NAWARA, JOSHUA NORRIS, MICHAEL O'CONNELL, GLENN ROSS, JAVIER RUEDA, FLAMUR TRASHANI, MATT VLAHOS, HARRY WHEELER, individually, and on behalf of all others similarly situated, Plaintiffs, v. COOK COUNTY SHERIFF'S OFFICE, THOMAS DART, in his individual capacity, SCOTT KURTOVICH, in his individual capacity, DENNIS ANDREWS, in his individual capacity, MICHAEL HOLMES, in his individual capacity, SALVADOR GODINEZ, in his individual capacity, GILBERTO ROMERO, JR., the COUNTY OF COOK, a unit of local Government, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 08 C 6621<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are nineteen correctional officers at the Cook County Department of Corrections who were part of the now-defunct Special Operations Response Team ("SORT").[1] They bring this action under 42 U.S.C. § 1983 against Cook County, the Cook County Sheriff's Office, Sheriff Thomas Dart, as well as several other officials from the Cook County Department of Corrections.

---

[1] Five additional former members of the SORT—Peter Giunta, Leon Harvey, Chris Kaloudis, Darryl King, Dave Steadman—are no longer parties to this action.

Plaintiffs allege that Defendants violated their First Amendment rights by disbanding SORT in retaliation for Plaintiffs' support of Richard Remus, one of Defendant Dart's opponents in the 2006 election for Cook County Sheriff. Defendants have moved for summary judgment. For the following reasons, Defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are drawn from the pleadings and the parties' Local Rule 56.1 submissions (hereinafter, "Defs.' 56.1" and "Pls.' 56.1").[2]

### I. The Parties

Plaintiffs are correctional officers who have been and remain employed at the Cook County Department of Corrections (hereinafter, "DOC"). (Defs.' 56.1 ¶ 1.) Defendant Thomas Dart has served as Cook County Sheriff since December 1, 2006. (*Id.* ¶ 4.) Defendant Dennis Andrews served as Assistant Executive Director of External Operations at the DOC from 2003 to 2006; he currently serves as a Captain in Division IV of the DOC. (*Id.* ¶ 6.) Defendant Michael Holmes served as Superintendent of External Operations at the DOC from 2006 to 2008; he currently works as an Administrative Duty Officer at the DOC. (*Id.* ¶ 7.) Defendant Salvador Godinez has served as Executive Director of the DOC since June 2006. (*Id.* ¶ 8.) Defendant Scott Kurtovich served as the acting Executive Director of the DOC from November 2004 to June 2006; he has since been promoted to First Assistant Executive Director. (*Id.* ¶ 5.) Defendant Gilberto Romero, Jr. served as Assistant Executive Director of the DOC from October 2006 to February 2007, and is now retired. (*Id.* ¶ 9; Romero Dep. 16.)

---

[2] Defendants contend that Plaintiffs have failed to comply with Local Rule 56.1 and ask this court to strike portions of Plaintiffs' Response to Defendants' Statement of Facts and Plaintiffs' Statement of Additional Facts. It is within the court's discretion to require strict compliance with the Local Rules. *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). Plaintiffs are not in strict compliance; they exceeded the court's order limiting their Rule 56.1 statement to 125 paragraphs, and included argumentative responses to that Rule 56.1 submission. The court nevertheless declines to strike portions of their pleadings at this time.

## II. Creation of the Special Operations Response Team

The Special Operations Response Team ("SORT") was created in the mid-1990's and consisted of a cadre of specially trained officers who staffed multiple departments throughout the DOC. (Defs.' 56.1 ¶ 12.) The SORT was not a "bidded assignment"; instead, applicants had to pass through a boot camp in order to be selected. (Pls.' 56.1. ¶¶ 5-6.) Members of SORT were assigned a variety of different tasks, including transporting high risk inmates to other correctional facilities and court hearings, conducting "shake-downs" of prison cells for contraband, serving as firearms instructors at the training academy, assisting the Chicago Police Department during protests, and patrolling the perimeter of the DOC compound. (Pls.' 56.1 ¶ 11.) While Defendants contend that selection to serve on the SORT was not a promotion, several Plaintiffs described being a member of SORT as "an aspiration," and the parties do not dispute that Plaintiffs experienced increased opportunities for overtime as a result of being on the team. (Defs.' 56.1 ¶ 14; Pls.' 56.1 ¶¶ 8, 14.) Within the DOC, SORT was known as a "close team," with members who not only worked together, but also supported each other personally. (Pls.' 56.1 ¶ 10; Jones Dep. 41.) Richard Remus served as the Assistant Executive Director of the SORT until 2003. (Defs.' 56.1 ¶ 13.) According to Plaintiffs, SORT was generally known throughout the Sheriff's office as "Remus's Unit," even after he was no longer in charge of the team. (Pls.' 56.1 ¶ 125.)

## III. Plaintiffs' Support for Remus's Campaign for Cook County Sheriff

In March 2006, Remus ran against Defendant Thomas Dart in the Democratic Primary for Cook County Sheriff. (*Id.* ¶ 4.) Despite the pressure they claim to have felt from their supervisors to support Defendant Dart, Plaintiffs actively supported Remus's campaign in a variety of ways by "attending fundraisers, getting signatures on petitions, putting up signs and posters, donating money, wearing buttons and stickers, volunteering to walk for Remus in the St. Patrick's Day parade, and campaigning on election day." (Am. Compl. ¶ 24-26; Pls.' Mem. in Opposition to Defs.' Mot. for Summ. J. (hereinafter, "Pls.' Mem.") at 12.) The parties dispute the extent of Defendants'

3

knowledge about Plaintiffs' support for Remus; Plaintiffs claim Defendants all knew that Plaintiffs supported Remus, but Defendants' testimony is more equivocal. Defendant Kurtovich testified that he could not be sure whether all of the Plaintiffs supported Remus's candidacy, but he did know that some SORT members showed support for Remus by placing bumper stickers on their cars. (Kurtovich Dep. 128-29, 131). Defendant Andrews also testified that he knew a group of SORT members supported Remus for Sheriff, but Andrews could not identify which Plaintiffs were participating in the campaign because they did not directly discuss it with him. (Andrews Dep. 154-56.) Defendant Holmes worked on Defendant Dart's campaign, and as a result, he reviewed the signatures on certain petitions supporting Remus. (Holmes Dep. 62.) Whatever the extent of their knowledge, it is clear that Defendants Kurtovich and Holmes supported Defendant Dart's campaign financially. (Campaign Disclosure List, Ex. HH to Pls.' 56.1; Holmes Dep. 60.)

Several Plaintiffs acknowledged that they had no direct conversations with Defendants regarding their political activity, but they claim they believed Defendants must have known they supported Remus's campaign due to their reputation within the DOC as "Remus's guys." (Cedeno Dep. 42; Hays Dep. 33; Lewis Dep. 101; Davis Dep. 15; Feddor Dep. 34; Diaz Dep. 43.) Plaintiff Burruss, for example, believes that Defendants knew of his support for Remus because Burruss was photographed at Remus fundraisers and his name appeared on petitions for Remus. (Burruss Dep. 44.) Plaintiff Canada concludes that Defendants were aware of his political activity because he was warned by one of his supervisors that department policy prohibited him from soliciting other officers for their signatures on campaign petitions outside of the training academy. (Canada Dep. 46.) Plaintiff Castellano claims he had several conversations with Defendants Kurtovich and Andrews regarding his support of the Remus campaign, though he could not recall the specific dates on which they spoke. (Castellano Dep. 25, 27-28.) Plaintiff Norris stated that he never had any conversations with Defendant Kurtovich regarding his support for Remus, but that he gave Defendants Andrews and Holmes updates on how the campaign was progressing on occasions

4

when they all shared a command post. (Norris Dep. 16.) Similarly, Plaintiff O'Connell testified that he discussed his support for Remus's campaign in the DOC's weight room with Defendants Andrews and Holmes. (O'Connell Dep. 17-20.)

Plaintiffs further claim that during the election season, certain responsibilities that SORT members had previously held were taken away, and it was rumored that SORT would be disbanded. (Pls.' Mem. at 3; Burruss Dep. 26, 36.) For instance, Plaintiff Burruss claims that he and other SORT members were "discredited" by being forced to undergo extra security pat downs and show identification while escorting inmates around the compound. (Burruss Dep. 52.) Plaintiff Burruss confronted Defendant Holmes about SORT's rumored dissolution and Holmes stated that he would "look into it," but never provided any direct explanation as to why certain duties were removed from SORT's command. (Burruss Dep. 41.) Plaintiff Cedeno described SORT as being under "constant scrutiny by the administration," and Plaintiff Jones noted that the Sheriff's Police took over SORT's duties for the arrest team unit around the same time that Remus announced his candidacy. (Cedeno Dep. 48; Jones Dep. 17.) Plaintiff Vhalos, who also supported Remus, stated that he "tried to keep it quiet because [he] feared retaliation from the Sheriff's Office." (Vhalos Decl. ¶ 3, Ex. RR. to Pls.' 56.1.)

## IV. Discontinuation of SORT

In May 2006, Plaintiff Feddor, the union representative for the SORT at that time, received a letter from the Sheriff's Office stating that SORT would soon be disbanded.[3] (Feddor Dep. 12, 43-44.) On June 9, 2006, Defendant Kurtovich sent a letter to the union attorney, T. Steven Calcaterra, stating that SORT was going to be replaced with a new response team called the Emergency Response Team ("ERT"). (Letter from Kurtovich to Calcaterra of 6/9/06, Ex. 15 to Defs.' 56.1.) The letter explained how the SORT's duties would change and described the selection

---

[3] Plaintiff Feddor could not recall the exact date that he received the letter, but thought it was approximately six months before the SORT was formally disbanded. (Feddor Dep. 12.)

5

process for the ERT. Feddor brought the letter he received to the attention of the union, and Plaintiffs held a meeting with union attorneys to discuss the situation. (Feddor Dep. 45; Jones Dep. 29.) During the meeting, when Plaintiff Burruss asked why a new unit was needed in light of the fact that the SORT team was already trained, union attorneys responded that SORT team members were not well liked by "the administration" in the DOC. (Burruss Dep. 33, 35.) On October 2006, all SORT members were notified that they needed to participate in a department-wide bidding process for new work assignments. (Defs.' Mem. at 5.)

Defendants have given highly conflicting accounts about who was ultimately responsible for the dissolution of SORT. Defendant Holmes testified that SORT was in his chain of command in 2006 and 2008 when he was Superintendent of External Operations. (Holmes Dep. 29.) He nevertheless testified that he does not know who made the decision to disband SORT and that he learned about the decision to create a new unit to take SORT's place from Defendant Romero around September 2006. (Holmes Dep. 29-30.) Defendant Romero claimed that the decision to disband SORT was made before he began working at the DOC in 2007, and that it was made by his superiors, namely, Defendants Godinez, Kurtovich, and Dart. (Romero Dep. 68.) Defendant Andrews testified that he was in charge of SORT until November 2006, but he did not participate in the actual decision to dissolve the unit. (Andrews Dep. 182.) When asked if he knew who made the decision, he stated that it "could have been anyone from Director Romero up to the Sheriff," including Director Kurtovich or Director Godinez. (Andrews Dep. 182.) Defendant Kurtovich testified that he helped with staffing decisions after SORT was disbanded, but that it was Defendant Godinez and "his bosses" who made the formal decision to disband SORT. (Kurtovich Dep. 63, 79-80.) Defendant Godinez claimed that he was only in charge of implementing the new response team, not disbanding SORT. (Godinez Dep. 53.) Defendant Dart has denied that he had final decision making authority to disband the SORT, though he admits that as Sheriff, he now does have policy-making authority for the Sheriff's Office as it relates to the creation and disbandment

of specialty units. (Dart Answers to Pls.' Requests to Admit (hereinafter, "Dart Answers") ¶¶ 1, 8-9, Ex. E to Pls.' 56.1)

As for the motivation behind the SORT's dissolution, Plaintiffs claim the real reason the team was disbanded was that they and other former SORT members supported Richard Remus instead of Defendant Dart for Sheriff. Plaintiff Lordo claims that during an informal meeting sometime in August 2006, Defendant Andrews told Lordo and other officers explicitly that SORT was going to be disbanded because they were supporting Richard Remus for Sheriff. (Lordo Dep. 9-10, 16.) Defendant Andrews did not indicate at the time who made the decision to dissolve the unit, but Lordo claims Andrews conveyed a sense that it was not his choice. (Lordo Dep. 12-13.) Plaintiffs Iacovetti and Lordo both claim that Defendant Andrews told them that the disbanding of SORT was "all political" because they were supporters of Remus. (Iacovetti Declaration, ¶ 4; Lordo Dep. 16.) Plaintiff Lordo also testified that it was his understanding that the superintendents conducted monthly meetings in which Defendant Kurtovich made it clear he "wanted anything that had anything to do with Remus wiped [out]," including the SORT. (Lordo Dep. 43.)

By contrast, Defendants characterize the dissolution of the SORT as a mere departmental management decision to restructure the DOC's response team. (Defs.' Reply Mem. at 10.) Defendant Romero explained that the overall goal for the new response team was for officers to be "more on hand with the operation of the institution" and to focus their work on the inside, rather than the outside of the compound. (Romero Dep. 54-55.) Defendant Kurtovich further clarified that the ERT would have a "proactive" deployment mission, unlike the "sit and wait for a situation to happen" approach that was, in Kurtovich's view, displayed by SORT. (Kurtovich Dep. 97-98.) Moreover, Romero suggested that SORT was not functioning as a team and described their work ethic as "'I'm in SORT and I don't have to do this . . . ." (Romero Dep. 65.) From his perspective, the SORT had "no leadership," and the switch to ERT would bring a "new ethics in accountability." (Romero Dep. 65, 68.)

7

**V.     Development of the Emergency Response Team**

On November 19, 2006, the Cook County Sheriff's Office formally discontinued the SORT program and members of the team were transferred to other divisions within the DOC. (Dart Answers ¶ 3.) Several Plaintiffs claim that they were under the impression that they would be "grandfathered in" to the new ERT and that the bidding process was "just a formality."[4] (Norris Dep. 9; Messina Dep. 45; Davis Dep. 11; Vlahos Dep. 18.) It was not. The application process for ERT included a physical exam, a satisfactory disciplinary record, and an oral interview. (Defs.' 56.1 ¶ 33.) Defendant Romero was assigned responsibility over the creation of ERT in February 2007. (Defs.' 56.1 ¶ 30.) He testified that the "[t]he opportunity was given to all officers, including the SORT officers, to participate in the physical (exam)," but that he personally made the decision about who received an interview for ERT. (Romero Dep. 67, 145; Holmes Dep. 39.) One of the interviewers, Defendant Holmes, explained that the interviews for ERT were conducted by three-member panels; each panel member scored the interview and then the panel submitted its combined score for each candidate to Defendant Romero. (Holmes Dep. 87.)

Several of the Plaintiffs chose not to apply to ERT, while others applied but were not selected.[5] Three of the Plaintiffs did eventually become ERT team members.[6] Plaintiffs do not

---

[4] Plaintiff Vhalos claims Defendant Romero told him that SORT members would be grandfathered in to the new response team if they passed the physical exam. (Vhalos Dep. 18.) Plaintiff Davis testified that Defendant Andrews suggested that the bidding process was unnecessary by saying, "I don't know what you guys are bidding for, you guys are not going anywhere." (Davis Dep. 11.)

[5] The following Plaintiffs chose not to apply to the ERT: Myron Jones; Joe Cedeno; Paul Castellano; Glenn Ross; Larry Kowaluk; and Harry Wheeler. (Defs.' 56.1 ¶ 35.) The following Plaintiffs applied for ERT and were rejected: Flamur Trashani, Charles Canada, John Nawara, Lyonell Davis, Anthony Lordo, Javier Rueda, Richard Messina, Michael O'Connell and Gregory Hays. (Defs.' 56.1 ¶ 36.) Plaintiff Norris applied for ERT, but did not complete the physical exam. (Norris Dep. 32-33.)

[6] Nelson Lewis, Richard Feddor and Matthew Vlahos became ERT members. (Defs.' 56.1 ¶ 37.) Plaintiffs Burruss and Iacovetti were selected for ERT, but ultimately chose not to
(continued...)

8

deny that they were given the opportunity to apply for ERT, but contend that after the unit's initial development, former SORT members were effectively blocked from participation in ERT.[7] Plaintiffs Vlahos and Feddor, who served on both SORT and ERT, recalled that ERT began refusing to accept any former members of the SORT team because of their association with Remus's campaign. (Feddor Dep. 51; Vlahos Dep 30-31.) Plaintiffs Vlahos testified:

> One day, while I was on ERT, Captain Dominguez [the supervisor of ERT] and I were discussing the fact that ERT was short-handed. I told him that there were 20 former-SORT guys that were already trained that could be on ERT. Dominguez said, 'you did not support Remus, right?' I told him that I did, but had kept it quiet. Dominguez told me that he had just returned from an ERT supervisors meeting where they said that no more SORT guys would be coming to ERT because of their support for Remus.

(Vhalos Decl. ¶ 7.) Plaintiff Feddor believes he was later removed from ERT because he was a supporter of Remus. (Feddor Dep. 46.)

On April 7, 2010, Plaintiffs filed their single count Amended Complaint under § 1983, alleging that Defendants disbanded the SORT because of their political affiliation with Remus's campaign for Sheriff. Plaintiffs claim that since the SORT was disbanded, they have had fewer opportunities for overtime hours. (Pls.' 56.1 ¶ 14.) Plaintiff Vhalos claims there has been "very little" opportunity for overtime since he joined ERT and testified: "There was that air of intimidation about it, if you put in for overtime . . . they're going to remove you from the team." (Vhalos Dep. 35-36.) Plaintiff Davis, who applied for ERT, but was turned down, stated that his overtime was "completely gone" once the SORT was disbanded. He claims that he has received some overtime in his assignments since November 2006, though not to the same extent as he received while on

---

[6](...continued)
participate. (Burruss Dep. 54; Iacovetti Dep. 41-44.) Plaintiff Diaz was selected for the ERT but was unable to complete the mandatory training sessions because of his military service. (Diaz Dep. 46, 49-50.)

[7] Plaintiffs do not say when exactly former SORT team members were blocked from ERT, nor do they identify which SORT members specifically were denied membership to ERT.

SORT. (Davis. Dep. 36.) Defendants dispute this, pointing to several other Plaintiffs' testimony and tabulations of their overtime hours. (Overtime Printout, Ex. 36 to Defs.' 56.1.; Canada Dep. 65; Kowaluk Dep. 48-49.) Plaintiffs point out that Defendants' tabulations show that Plaintiffs had substantial overtime hours through 2006, but very little in 2007 and 2008 once the SORT was dissolved. (Pls.' 56.1 ¶ 14.) Plaintiffs now seek "[a]ll wages and benefits [they] would have received but for the retaliation," but they do not contend there was a reduction in their base hourly rate as a result of the discontinuation of SORT. (Am. Compl. ¶ 41(a); Defs.' 56.1. ¶ 66.)

## ANALYSIS

Summary judgment is proper if "the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court construes all facts and draws reasonable inferences in favor of the nonmoving party. *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).

Plaintiffs allege that Defendants retaliated against them for supporting Defendant Dart's rival candidate for Cook County Sheriff by disbanding SORT. It is well-established that "public employees may not be made to suffer adverse job actions because of their political beliefs." *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990); *Elrod v. Burns*, 427 U.S. 347, 357 (1976)). Thus, as a general rule, "hiring, firing, or transferring government employees based on political motivation violates the First Amendment . . . ." *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). The parties here interchangeably refer to Plaintiffs' claims as one of either First Amendment retaliation or political affiliation. The Seventh Circuit has "cautioned against use of the term 'retaliation' to describe cases in which an employer

has punished an employee for protected speech, noting that infringement on First Amendment rights occurs both when employers deter future speech as well as when they punish past speech." *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 n.9 (7th Cir. 2010) (citing *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)). Based on the facts in this case, the court construes Plaintiffs' claim generally as a First Amendment political affiliation claim.

## I. Political Affiliation Claim

In order to make out a First Amendment political affiliation claim, a plaintiff must establish three elements: (1) the employee's speech was constitutionally protected; (2) the employee suffered a deprivation because of his employer's adverse action; (3) and but for the protected speech, the employer would not have taken the same adverse employment action. *Kodish*, 604 F.3d 490 at 501 (citing *Gunville v. Walker*, 583 F.3d 979, 983 (7th Cir. 2009); *Fairley*, 578 F.3d at 525-26 (7th Cir. 2009)). Plaintiffs here have alleged a "direct case" of retaliation based on their political affiliation. "Under the direct method, the plaintiff survives summary judgment if he can demonstrate 'triable issues as to whether discrimination motivated the adverse employment action.'" *Kodish*, 604 F.3d at 501 (quoting *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)). Defendants do not dispute that Plaintiffs were engaged in constitutionally protected activity. Instead, they contend that (1) Defendants had no personal knowledge of Plaintiffs' political activity; (2) Plaintiffs have failed to show they suffered any deprivation; and (3) Plaintiffs have not established a causal link between their support of Remus's campaign and the discontinuation of the SORT. The court disagrees and finds that Plaintiffs have presented sufficient circumstantial evidence of retaliation to survive summary judgment.

### A. Defendants' Knowledge of Plaintiffs' Political Activity

Defendants argue that Plaintiffs have failed to show that any of the individual defendants had personal knowledge of Plaintiffs' political affiliation. (Defs.' Mem. at 16.) As a threshold matter, Defendants are correct that Plaintiffs must first prove that Defendants had actual knowledge of their

political affiliation in order to establish that their political activities were the cause of Defendants' decision to disband SORT. *Zerante v. DeLuca*, 555 F.3d 582, 585 (7th Cir. 2009); *Nelms v. Modisett*, 153 F.3d 815, 819 (7th Cir. 1998). The court finds that Plaintiffs have shown there is a genuine dispute of fact on this issue.

While many Plaintiffs testified that Defendants must have known about their support of Remus's campaign because they were generally known as "Remus's guys," Plaintiff also offered evidence that they expressed their support for Remus in concrete ways by attending fundraisers, soliciting signatures on campaign petitions, and posting signs. Moreover, Plaintiffs Castellano, Norris, and O'Connell all recounted times when they spoke directly with Defendants regarding their support for Remus's campaign. In addition, Defendants Andrews and Kurtovich both testified that they were aware that a group of SORT members were supporting Remus. All of these facts lead the court to conclude that Plaintiffs have presented a genuine issue of material fact about Defendants' knowledge of Plaintiffs' political affiliation.

### B. Deprivation

Defendants urge that Plaintiffs cannot demonstrate that any deprivation occurred in this case. The court recognizes that Plaintiffs were not fired, but the issue of whether they were "selectively demoted" has more traction. (Defs.' Mem. at 15.) Defendant Dart denied that the SORT was considered an "elite unit," but Defendants do not dispute that Plaintiffs were "competitively selected" and "specially trained." (Dart Answers ¶ 7; Defs.' Resp. to Pls.' 56.1 ¶¶ 1-2.) Thus, once the SORT was discontinued, Plaintiffs went from holding a non-bidded assignment to being required to participate in a department-wide bidding process for alternative roster spots within the DOC. (Defs.' Mem. at 15.) While several Plaintiffs were ultimately selected for the ERT, they nevertheless had to pass a new physical exam and sit for an oral interview.[8]

---

[8] Those Plaintiffs who chose not to seek membership in ERT, or who were successful
(continued...)

Moreover, Plaintiffs' overtime opportunities in the wake of SORT's dissolution are in dispute. Numerous Plaintiffs testified that they enjoyed enhanced opportunities for overtime work while on the SORT and found fewer opportunities for overtime hours after the dissolution of SORT in 2006. (Lordo Dep. 48; Diaz Dep. 62; Cedeno Dep. 55-56; Nawara Dep. 47; Iacovetti Dep. 56-57; Messina Dep. 71-72; Norris Dep. 30.) Defendants do not dispute that Plaintiffs worked increased overtime while part of SORT, but urge that Plaintiffs continue to earn overtime. (Defs.' 56.1 ¶¶ 16, 64.) As far as the court can tell, several Plaintiffs—both current members of the ERT and not—have experienced at least some reduction in overtime hours since the dissolution of SORT. For instance, Plaintiff Canada, who was not selected for the ERT, earned 16 hours of overtime in 2007 but none in 2008. (Overtime Printout, Ex. 36 to Defs.' 56.1.) Plaintiff Burruss, who was selected for the ERT but chose not to participate, earned 747 hours 2006, but only 20 hours in 2007 and 49 hours in 2008. (*Id.*) Plaintiff Lewis earned 318 hours in 2006 while on SORT; once a member of the ERT, Lewis earned 212 hours in 2007 and 157.5 in 2008. (*Id.*) Plaintiffs clearly depended upon their overtime pay as a significant supplement to their salary while on the SORT. (Lordo Dep. 48.) Viewing the evidence in the light most favorable to Plaintiffs, the court finds that a genuine issue of fact as to whether Plaintiffs suffered a deprivation as a result of SORT's disbanding.

**C.    Causation**

Defendants argue that Plaintiffs cannot show that their protected political activity was the but-for cause of SORT's discontinuation. (Defs.' Mem. at 15-17.) On summary judgment, a plaintiff need only present evidence "from which a reasonably jury could find causation; no more is necessary at this stage . . . ." *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) (finding jail guards could recover from fellow officers who made threats against them for reporting prisoner

---

[8](...continued)
in their application for membership, arguably were not injured in the same way as were those Plaintiffs who were turned down for ERT. Defendant has not argued that the court should dismiss some Plaintiffs' claims for this reason, however, so the court declines to address the matter further.

13

abuse to jail supervisors); *see also McDonough v. City of Chicago*, No. 06 C 2732, ___ F. Supp. 2d ___, 2010 WL 3894239, at *9 (N.D. Ill. Sept. 29, 2010) (denying summary judgment in part where city employee complained about conduct of other city workers' inappropriate behavior and promotions based on political factors). As mentioned above, Plaintiffs have proceeded with a direct case of political retaliation that does not require a "burden shifting, pretext analysis." *Uvalle v. Dominick*, No. 09 C 3665, 2011 WL 589620, at * 5 (N.D. Ill. Feb. 10, 2011) (citing *Kodish*, 604 F.3d at 501). "'Direct' proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion [. . .] , but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Kodish*, 604 F.3d at 501 (quoting *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008)). Circumstantial evidence includes "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Darchak*, 580 F.3d at 63. The court finds that Plaintiffs have met their burden on causation through circumstantial evidence in this case.

As explained above, the court concludes that Plaintiffs have presented sufficient circumstantial evidence to support a finding that Defendants knew of their support for Remus's campaign. As for the causal link between their political activity and the SORT's dissolution, Plaintiffs point to the following facts: (1) prior to the SORT's dissolution, Defendant Kurtovich stated in monthly superintendent meetings that he wanted to abolish SORT and "anything having to do with Remus"; (2) Defendant Andrews admitted to several Plaintiffs that the discontinuation of SORT was "political"; (3) once the ERT was established, Captain Dominguez told Plaintiffs Vlahos and Feddor that the ERT would not accept any former members of the SORT team because of their association with Remus.

The court also observes the striking similarity between the duties of SORT and ERT. Plaintiff Vlahos, a member of both SORT and ERT, stated: "the duties we did on ERT were just some of the very same assignments we had on SORT. . . . ERT members waited to receive their

14

assignments and respond to emergencies just like SORT." (Vhalos Decl. ¶ 5.) Defendant Dart disputes Plaintiffs' assertion that ERT was created to replace SORT and that the duties on the two teams were the same. (Dart Answers ¶¶ 27-28.) Yet he acknowledges in response to requests to admit that numerous duties—including conducting high risk movements, guarding inmates while at medical facilities, conducting searches of tiers for contraband, transporting inmates from the jail to court, and handling riots—are, in fact, exactly the same. (Dart Answers ¶¶ 30-39.) Plaintiffs' evidence therefore casts doubt on Defendants' claim that ERT was created with a "new focus" to restructure the department and that the decision was entirely unrelated to Plaintiffs' support of Remus. Plaintiffs have presented sufficient evidence from which a reasonable jury could find causation.

## II. Qualified Immunity

Plaintiffs allege that all Defendants participated in the decision to disband the SORT, had knowledge of the retaliation against Plaintiffs, and failed to take action to terminate or prevent such conduct. (Am. Compl. ¶¶ 30-31.) Plaintiffs claim further that Defendants "have a long enduring custom or policy of making employment decisions based on political affiliation." (Pls.' Mem. at 5; Pls.' 56.1 ¶ 68.) Defendants argue that Plaintiffs cannot show that the decision to dissolve the SORT was clearly unlawful and Plaintiffs cannot demonstrate individual liability. (Defs.' Mem. at 19.) In order to determine whether Defendants are entitled to qualified immunity, the court must examine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The "'very action in question' need not have been previously held unlawful, but, in the light of pre-existing law, the unlawfulness of the action must be apparent." *Sivard v. Pulaski County*, 17 F.3d 185, 189 (7th Cir. 1994) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As previously noted, it is well-established that "public employees may not be made to suffer adverse job actions because of their political beliefs." *Carlson*, 374 F.3d at 464 (citing *Rutan*, 497

U.S. at 79 (1990)). Thus, it should have been clear to Defendants that they could not discontinue SORT in retaliation for Plaintiffs' support of Defendant Dart's political opponent. Defendants may argue that the decision to restructure the response team was based on legitimate departmental objectives, but Plaintiffs have already presented a genuine issue of material fact as to whether the decision was in fact politically motivated. Therefore, the court must turn next to the individual Defendants' personal involvement.

### A. Individual Defendants

An individual defendant cannot be held liable under § 1983 unless he "caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). "A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Id* (citing *Rizzo v. Goode*, 423 U.S. 362, 371 (1976)). Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact that Defendants Holmes, Andrews, Kurtovich, Romero, and Godinez were all personally involved in the constitutional wrongdoing. Plaintiffs have presented evidence that each Defendant knew of Plaintiffs' support for Remus. And Defendants' own conflicting testimony raises a genuine issue about who participated in the decision to dissolve the SORT and establish the ERT.

The question of Defendant Dart's individual liability poses a closer call. Plaintiffs make no factual allegations with respect to Defendant Dart other than to state that Defendant Dart, as Sheriff of Cook County, has policy making authority for the Sheriff's Office and therefore, had control over the disbanding of SORT. (Am. Compl. ¶ 11; Pls.' 56.1 ¶ 71.) Yet Dart did not become Sheriff until December 1, 2006 and Plaintiffs were informed that they needed to submit bids for new work assignments in October 2006. Moreover, Plaintiffs present no direct evidence that Defendant Dart was even aware of Plaintiffs' opposition to his campaign, other than to state that their support for Remus's campaign was generally known within the DOC. On the other hand, when asked in requests to admit about his knowledge of SORT members' support for Remus, Dart refused to

16

directly answer. (Dart Answers ¶¶ 18, 44.) While there is "no principle of superiors' liability," Plaintiffs are correct that supervisors may be liable for the their subordinates' misconduct if they "know about the conduct, facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Still, "supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable . . . ." *Id.* As Plaintiffs have failed to present any evidence that Defendant Dart knew of Plaintiffs' support for Remus or turned a blind eye to other Defendants' behavior, the court dismisses Plaintiffs' claims against Defendant Dart.

### B. Sheriff's Office

Under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), municipal agencies are only subject to liability under § 1983 if a plaintiff can show: "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Darchak*, 580 F.3d at 629 (citations omitted). Defendants claim that Plaintiffs cannot establish liability for the Sheriff's Office here because there is no constitutional violation resulting from an official policy or widespread practice. (Defs.' Mem. at 20.) Yet Plaintiffs allege, and Defendants do not dispute, that all Defendants had policymaking authority for the Sheriff's Office. (Pls.' 56.1 ¶ 72-76; Dart Answers ¶¶ 9.) The challenged decision was a matter within that policymaking authority; at least, Defendants have not argued otherwise. As a result, the Sheriff's Office can be held liable for Defendants' decision to disband the SORT if it was due to political reasons. Because Plaintiffs have produced enough evidence to raise disputed issues of fact about regarding Defendants' role in the decision to disband the SORT, the court finds Defendants' *Monell* arguments unpersuasive, and summary judgment for the Sheriff's Office is denied.

### **CONCLUSION**

For the following reasons, Defendants' motion [64] is granted with respect to Defendant

Dart and denied as to all remaining Defendants.

                                  ENTER:

Dated: March 9. 2011                  _____
                                  REBECCA R. PALLMEYER
                                  United States District Judge