**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM BURRUSS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE, | ) | |
| COUNTY OF COOK, SHERIFF TOM DART, | ) | |
| SCOTT KURTOVICH, DENNIS ANDREWS, | ) | No. 08 C 6621 |
| MICHAEL HOLMES, SALVADOR GODINEZ, | ) | |
| and GILBERTO ROMERO, JR., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, 21 correctional officers employed by the Cook County Sheriff's Office, once worked as part of a specialized unit, the Special Operations Response Team ("SORT"), in the Cook County Jail. SORT was disbanded in 2006. In this lawsuit, Plaintiffs allege that Defendants—the Cook County Sheriff's Office, and several officials of that office—disbanded SORT to retaliate against Plaintiffs for having supported Richard Remus in his unsuccessful 2006 primary bid against Tom Dart, the Cook County Sheriff. Plaintiffs brought this action under 42 U.S.C. § 1983, charging that Defendants violated their First Amendment rights by disbanding SORT.

At the conclusion of a three-week trial last year, the jury found for Plaintiffs against the Cook County Sheriff's Office ("the County" or "Cook County") and a single individual Defendant—Scott Kurtovich, who worked temporarily as Acting Executive Director of the County's Department of Corrections and then as its First Assistant Executive Director. The jury awarded more than $1.3 million in total compensatory damages as well as $210,000 in punitive damages against Defendant Kurtovich. (Minute Entry 9/4/12 [189].) Defendants Cook County and Kurtovich now move for judgment notwithstanding the verdict under Rule 50(b). (Defs.' Mot. & Mem. of Law in Support of J. Notwithstanding the Verdict [192], hereinafter "Defs.' Mot.", at 2.) Defendants argue that

(1) Plaintiffs did not prove that their support for Remus in the primary election was a motivating factor in Defendants' decision to disband SORT; (2) even if the decision was politically motivated, Defendants are not liable because SORT would have been disbanded anyway; and (3) the evidence was insufficient to support an award of punitive damages against Kurtovich. Defendants also contend that certain Plaintiffs lacked standing because they failed to disclose their interests in this case in bankruptcy. For the reasons explained below, Defendants' motion [192] is granted in part and denied in part. Plaintiffs' motions to join Plaintiff Ross's and Plaintiff Vlahos's bankruptcy Trustees [242 and 243] are granted.

## FACTUAL BACKGROUND

SORT was created in the mid-1990's and consisted of a cadre of specially-trained officers who were assigned a variety of specialized tasks in the County's Department of Corrections ("DOC"), including transporting high-risk inmates to other correctional facilities and court hearings, conducting "shake-downs" of prison cells for contraband, serving as firearms instructors at the training academy, assisting the Chicago Police Department during protests, and patrolling the DOC compound perimeter. SORT was known within the DOC as a close-knit group whose members supported each other personally. *Burruss v. Cook Cnty. Sheriff's Office*, No. 08 C 6621, 2011 WL 856635, *1 (N.D. Ill. Mar. 9, 2011).

While working as SORT members, Plaintiffs engaged in various political activities in support of Richard Remus's candidacy for Cook County Sheriff in the 2006 Democratic primary election. Plaintiffs testified at trial that their support for Remus—who headed SORT for a time—was well-known throughout the Department of Corrections. Plaintiffs also testified that several County command staff members who were potentially involved with the decision to disband SORT commented unfavorably to Plaintiffs about their support for Remus. Among other allegations, Plaintiffs asserted that (1) DOC Superintendent Michael Holmes asked certain Plaintiffs about their

2

support for Remus at a SORT picnic and told Gilberto Romero, the DOC Assistant Executive Director of Security, that the SORT unit was "not loyal"; (2) Kurtovich told Plaintiff Paul Castellano that by backing Remus, Plaintiffs were "betting on the wrong horse"; (3) a supervisor told Plaintiff Chuck Canada that he could be disciplined for collecting signatures for Remus on election-related petitions at Morraine Valley College while Canada was off-duty; (4) a captain at the DOC warned Plaintiffs to "be careful supporting Remus – they [Defendants] are watching you guys"; and (5) DOC Superintendent Thomas Snooks informed Plaintiff Anthony Lordo that Kurtovich had expressed his desire in command staff meetings before SORT's disbandment to "get rid of all things Remus."

After SORT was disbanded, Defendants created a new specialized unit in the DOC, the Emergency Response Team ("ERT"). Plaintiff Matt Vlahos asserted that, after the formation of ERT in 2007, an ERT lieutenant told him that SORT members would not be admitted to the ERT unit because of their previous political support for Remus. (Pls.' Resp. to Defs.' Rule 50(b) Mot. [237], hereinafter "Pls.' Resp.", at 6-8; Vlahos Testimony, Ex. 3 to Pls.' Resp., at 42:4-24.) Plaintiff Lordo also testified that then-DOC Assistant Executive Director of External Operations Dennis Andrews, who was present in conversations among command staff about disbanding SORT, told SORT members sometime during the three-month period before the unit was officially disbanded that SORT was being disbanded for political reasons. (Lordo Dep., Ex. M to Pls.' Mot. to File Pls.' Resp. to Defs.' Mot. for Summ. J. [87], hereinafter "Pls.' Summ. J. Resp.", at 15:16-24, 16:1-9.)

The record provides little detail about Remus, but it is undisputed that he was once himself a SORT officer and that he commanded the loyalty of most of his fellow SORT members. The 2006 Democratic primary election for Cook County Sheriff was held on March 21, 2006. Remus lost. Remus's opponent in the election, Tom Dart, became Sheriff after the general election in November 2006. At some point after the primary election, Kurtovich—who served as the DOC's Acting Executive Director from November 2004 to June 2006 before becoming the DOC's First

Assistant Executive Director[1]—recommended disbanding SORT. (Defs.' 56.1 [64-3] ¶ 5.) The record does not specify when or to whom Kurtovich allegedly first made this recommendation beyond testimony from Plaintiffs that they heard rumors that he had expressed an intention to make this recommendation to other DOC managers. The decision to disband SORT was the central focus of Plaintiffs' claim; they asserted that the decision was made to retaliate against them for backing Remus in the primary and that Kurtovich was a key player in that decision. Despite this focus, there was limited evidence at trial about when and how the decision was made.

It is undisputed that SORT was officially disbanded on November 19, 2006 under the direction of DOC Executive Director Salvador Godinez. (Defs.' Mot. at 4.) The parties do dispute the extent of Godinez's role as decision-maker in disbanding SORT. Godinez became the Executive Director in June 2006, and had been in his post for just five months when SORT was disbanded. He testified at trial that (1) he was not aware of Plaintiffs' political affiliation; (2) he decided to disband SORT because of DOC operational needs and SORT's "counterproductive" culture; and (3) his decision was not influenced by any improper considerations. Defendants view this testimony as unrebutted. (Defs.' Mot. at 8; Def. Scott Kurtovich's Supplement to the Rule 50(b) Mot. [234], hereinafter "Kurtovich's Supp.", at 1; Defs.' Am. Reply Brief [254-1], hereinafter "Defs.' Reply", at 2-6.) As Plaintiffs emphasize, however, Godinez's testimony on this score was effectively impeached, as he admitted in his deposition that the decision to disband SORT "absolutely" was made before he became Executive Director, though he was "prepared to go forward with it." (Pls.' Resp. at 10.) No documentary evidence sheds light on the nature of Godinez's involvement in the decision.

At the conclusion of the evidence, the court gave instructions about liability under the First

---

[1]     The record does not specify why Kurtovich was named Acting Executive Director.

Amendment in language substantially proposed by Plaintiffs. (8/27/12 Minute Entry [178].)[2]  On the third day of deliberations, the jury sent a note in which they expressed concern that the instructions appeared to permit the "guilty individual(s) . . . to politically discriminate at will so long as SORT would have been disbanded anyway" and asked for confirmation of whether that was accurate.  (8/30/12 Jury Note [192-1].)  The court sustained Defendants' objection to any substantive response to this question, instead directing the jury to re-read and consider the instructions it had been given and to continue deliberations.  (Defs.' Mot. at 2; Pls.' Emergency Mot. for Clarification [184] at 1-2.)  Several days later, the jury found in favor of Plaintiffs and against the County and Kurtovich, but entered findings in favor of Godinez and two other DOC officials.

Defendants moved for a directed verdict under Federal Rule of Civil Procedure 50(a) before the jury verdict.  They now renew their request in a Rule 50(b) motion for judgment notwithstanding the verdict.  Defendants offer a variety of arguments for overturning the verdict, including that (1) Kurtovich is entitled to qualified immunity; (2) no rational jury could find that Defendants retaliated against Plaintiffs for their political support for Remus; and (3) the punitive damages awarded against Kurtovich are inappropriate.  In addition, Defendants argue that six of the Plaintiffs lack standing to seek any recovery because they failed to properly disclose their claims in bankruptcy filings.  The court examines each argument in turn.

## DISCUSSION

**Standard for a Rule 50(b) motion**

Judgment as a matter of law is appropriate when a party has been fully heard on an issue

---

[2]    The jury instructions stated: "Plaintiffs must show by a preponderance of the evidence: (1) Plaintiffs supported . . . Remus during the [election]; (2) Plaintiffs' political support . . . for Richard Remus was a reason, alone or with other reasons, that the Defendants relied on when they disbanded [SORT] or that moved the Defendants toward the decision to disband [SORT]; and (3) Plaintiffs suffered harm."  Jury Instructions [191], at 20.  The instructions added: "If you find that the Defendants would have disbanded [SORT] even in the absence of Plaintiffs' political support or perceived political support for Richard Remus, then your verdict should be for Defendants."  *Id.*

and there is "no legally sufficient evidentiary basis for a reasonable jury to find for that party."

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000) (quoting FED. R. CIV. P. 50(a)).

A Rule 50(b) motion renews a pre-verdict Rule 50(a) motion, and is considered under the same

standard. The court "construe[s] the facts strictly in favor of the party that prevailed at trial" by

"drawing all reasonable inferences in that party's favor and disregarding evidence favorable to the

moving party that the jury is not required to believe." *May v. Chrysler Group, LLC*, 716 F.3d 963,

971 (7th Cir. 2013) (affirming denial of defendant's motion for judgment as a matter of law)

(citations and internal quotation marks omitted). The court's assessment of the nonmoving party's

evidence should be "highly charitable." *Id.* The court will set aside the jury's verdict for Plaintiffs

only if "no rational jury" could have found in their favor. *Waite v. Bd. of Trs. of Ill. Cmty. Coll. Dist.

No. 508*, 408 F.3d 339, 343 (7th Cir. 2005) (citations and internal quotation marks omitted).

## I. Defendants' Liability

### A. Qualified Immunity

Defendants first argue that Plaintiffs did not show that Kurtovich—the only individual Defendant

found liable by the jury—violated any of Plaintiffs' clearly established rights.[3] In support, Defendants

cite *Hernandez v. Sheahan*, a case involving a challenge by other SORT members to the County's

decision to investigate them after six inmates escaped from a special unit of the Cook County Jail

in 2006. (Defs.' Mot. to Supplement Its Rule 50(a) and 50(b) Mots. [283], hereinafter "Defs.' Supp.",

at 2, 6, citing *Hernandez*, 711 F.3d 816 (7th Cir. 2013).) The *Hernandez* plaintiffs argued that they were

investigated in retaliation for their political support for Remus in the 2006 Democratic primary election.

---

[3] The County (which is not eligible for qualified immunity) was the first to contend that Kurtovich is entitled to qualified immunity [283], but Kurtovich later adopted that argument in his own motion [290]. *See Owen v. City of Independence*, 445 U.S. 622, 657, 100 S. Ct. 1398, 1418 (1980) (holding that municipalities have no immunity from damages for constitutional violations under section 1983); *Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006) ("[U]nits of government are not entitled to [qualified] immunity in suits under § 1983.").

Rejecting this contention, the Seventh Circuit concluded that the six violent felons' escape from custody gave the County probable cause for investigating the SORT members. Because it was "objectively reasonable to investigate officers implicated in a multi-felon jailbreak," the Seventh Circuit observed, the defendants were shielded by qualified immunity. *Hernandez*, 711 F.3d at 818.

In reaching its decision, the Seventh Circuit noted that one of the officers who was investigated confessed to having assisted the inmates' escape and implicated the other plaintiffs in a signed statement that a state court ruled was voluntary. In light of the fact that the defendants in *Hernandez* had probable cause to investigate the SORT officer plaintiffs, the court was "less concerned about other possible motivations for [defendants'] treatment [of plaintiffs]." *Id.* In the case before this court, Kurtovich contends that the inmate escape discussed in *Hernandez* similarly provided an objective and reasonable basis for disbanding SORT in 2006. (Defs.' Supp. at 3.) In Kurtovich's view, *Hernandez* establishes that there was an objectively reasonable justification for disbanding SORT—the jail break—and he is therefore shielded by qualified immunity. (*Id.*)

*Hernandez* does not provide a basis on which this court can set aside the jury's verdict, however, for several reasons. Most significantly, the evidence discussed in *Hernandez* was not admitted at trial in this case because Plaintiffs moved *in limine* [154] to bar it, and the court granted that motion. In support of barring the evidence, Plaintiffs noted that "[n]one of the Plaintiffs . . . were on duty during the escape;" that "Defendants have not asserted as a defense that SORT was disbanded due to the escape;" that "Defendants have not produced any documents relating the escape to the disbanding of SORT;" and that "[n]one of the Plaintiffs were charged with any misdeeds relating to the escape." (Motion in Limine No. 2 [154-1] at 2.) As Defendants did not disclose the escape as a basis for their decision during discovery, they may not raise the matter now, post-trial, as a basis for overturning the jury's verdict.

In any event, even if evidence about the escapes had been admitted, the circumstances in this case are distinguishable. After a major breach of security and inmate escape, the

7

*Hernandez* defendants decided to investigate SORT members identified by a fellow officer as having been involved. The *Hernandez* defendants had a direct and specific explanation for their investigation—in marked contrast to this case, where Defendants have offered no documentary evidence of their reasons for disbanding the entire SORT unit, or the process by which that decision was made. Nor does Godinez's general testimony that he disbanded SORT because of "operational needs" and SORT's "counterproductive" culture rise to the same level of objective reasonableness as the facts in *Hernandez*. (Defs.' Supp. at 4.) The Seventh Circuit's recent decision in *Hernandez* does not entitle Kurtovich or any other Defendant to qualified immunity.[4]

### B. Evidence of Retaliation

Defendants next contend that Plaintiffs failed to establish that their support for Remus was a motivating factor in Defendants' decision to disband SORT. (Defs.' Mot. at 4.) A "motivating factor" is one that is a "sufficient condition" for an adverse action. *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011) (discussing causation in First Amendment cases).[5] In pressing their insufficiency-of-the-evidence argument, Defendants characterize the evidence of a political motivation as no more than "numerous random incidents and occurrences taking place subsequent to [Plaintiffs'] political activities." (Defs.' Mot. at 4.) These "miscellaneous occurrences" of Defendants' perceived negative treatment of Plaintiffs are unrelated to the disbandment of SORT, Defendants insist,

---

[4]     In light of this disposition, the court does not address Plaintiffs' contention that Defendants waived their qualified immunity argument by failing to raise it in motions after summary judgment. The court also declines to address Defendants' contention that Plaintiffs have not shown that they suffered an adverse action within the meaning of section 1983 because Defendants only argued it in a reply brief [249] they have since withdrawn. (3/5/13 Minute Entry [263].)

[5]     In *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court held that retaliation claims brought under Title VII must be proved according to traditional principles of but-for causation. First Amendment retaliation claims in this Circuit remain governed by the *Mt. Healthy* test. *See Mt. Healthy*, 429 U.S. at 287; *see generally Smith v. Wilson*, 705 F.3d 674 (7th Cir. 2013); *Peele v. Burch*, No. 12-3562, ___ F.3d ___, 2013 WL 3455705, *3 (7th Cir. July 9, 2013) (reversing summary judgment for defendant where detective alleged he was transferred for political reasons). .

because Plaintiffs "provide nothing to connect Kurtovich to any of their complaints." (*Id.* at 5.) For example, Defendants argue that statements made by County employees other than Kurtovich are "irrelevant" and do not qualify as evidence of Kurtovich's retaliatory motivation. (*Id.* at 7, citing *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1221 (7th Cir. 1991) ("Statements by inferior employees are not probative of an intent to discriminate by the decisionmaker" under the ADEA) and *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir. 1989) (actions and comments by employees not involved in a discharge decision do not evidence discrimination in that decision).)

With respect to statements made by Kurtovich himself, Defendants contend that those statements are insufficient evidence of retaliation because they are too "isolated" and "attenuated" to establish an intent to retaliate against Plaintiffs for their political activities. (Defs.' Mot. at 8, citing *Williams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003) (isolated comments are probative of unlawful intent only if they are contemporaneous with or causally related to the challenged decision).) Plaintiffs assert, for example, that Kurtovich told Plaintiff Castellano that he was backing "the wrong horse" by supporting Remus. (Pls.' Resp. at 6-8.) Defendants reply that the statement, if Kurtovich actually made it, was not connected to the decision to disband SORT. (Defs.' Mot. at 8.) Castellano testified that he told Kurtovich during conversations in December 2005 and March 2006 outside the SORT command post that he (Castellano) was supporting Remus in the election for Sheriff, and Kurtovich responded to those comments only by saying that Castellano was "betting on the wrong horse, that [Remus] didn't stand a chance." Trial Tr. 8/22/12 1731:1-4, 1732:14-15. Castellano did not perceive the comment as a threat or a warning at the time, and characterized the conversation as "no big deal." *Id.* at 1732:15-16. Plaintiff Michael O'Connell similarly testified that, in a conversation just one week before the election, Director Andrews said SORT members were "backing the wrong horse" by supporting Remus. Trial Tr. 8/22/12 1758:22-1759:5. O'Connell perceived that statement not as a threat but as "just out of pity." *Id.* at 1779:23-24.

Plaintiffs note other comments about Remus that they deem more troubling evidence of

9

retaliatory intent. Plaintiff Lordo testified that Superintendent Snooks acknowledged, years later, that Kurtovich had wanted "to get rid of" everything associated with Remus. (Pls.' Resp. at 6-8.) Specifically, in a conversation in Superintendent Snooks's office early in 2010, Lordo asserted, Superintendent Snooks "ma[de him] aware" that during the course of monthly superintendent meetings before SORT was disbanded, "Kurtovich was adamant about getting rid of SORT." Trial Tr. 8/15/12 886:22-888:7. Lordo also testified that on August 15, 2010, Superintendent Snooks reported to him that, during those superintendent meetings before SORT's disbandment, "Kurtovich [had been] yelling and screaming about how he wanted to get rid of SORT and everything that Remus had anything to do with." *Id.* at 918:18-23.

This evidence is insufficient to establish an intent to retaliate, Defendants contend. They cite *Brown v. Cnty. of Cook*, where the Seventh Circuit held that a statement by a Sheriff's Department employee that another employee should "call [his] clout" was not enough evidence for a political affiliation retaliation claim because the context did not make clear that the statement referred to impermissible political clout. 661 F.3d 333, 336 (7th Cir. 2011). In Defendants' view, neither Kurtovich's alleged statements regarding SORT and the 2006 primary election, nor the fact that SORT was disbanded after the primary election is sufficient to support an inference of retaliation. They urge that Plaintiffs presented neither a "pattern of political discrimination" nor any "direct testimony showing that the decisionmaker was looking to get rid of a political opponent." (Defs.' Mot. at 4.) Even if the jury did not believe the reasons Defendants offered for disbanding sort, Defendants believe the verdict is flawed because Plaintiffs did not provide enough evidence of their own. (Defs.' Am. Reply Brief in Supp. of J. Notwithstanding the Verdict [261], hereinafter "Cnty.'s Reply to Pls.' Resp.", at 11.)

A reasonable jury could have reached a different result on this record, but the court is not inclined to disturb the verdict on that basis. The evidence surrounding the decision-making process was murky, but the jury reasonably could have interpreted statements by Kurtovich and other County

employees involved in it as evidence of a retaliatory intent. Particularly given the dearth of evidence about when, how, or by whom the decision to disband SORT was made, the jury could reasonably have concluded that, in disbanding SORT, Defendants intended to retaliate against Plaintiffs for supporting Remus. *See Cloe v. City of Indianapolis*, 712 F.3d 1172, 1184 (7th Cir. 2013) (Hamilton, J., concurring) (noting the troubling "absence of an identified decision-maker and reason" for defendant employer's decision to discipline and terminate disabled employee). The jury weighed considerable testimony from Plaintiffs that (1) their support for Remus was well-known at DOC, including by Kurtovich; (2) Kurtovich himself supported Remus's opponent, Tom Dart; and (3) Kurtovich subjected Plaintiffs to negative treatment—most notably the disbandment of SORT—soon after that primary election. (*See, e.g.,* Kurtovich Dep., Ex. BB to Pls.' Summ. J. Resp. at 128:9-22 (Kurtovich learned through "scuttlebutt" that SORT members supported Remus); Defs.' Resp. to Pls.' Addn'l Facts [102] ¶ 26 (Kurtovich financially supported Dart's campaign); Lordo Dep. 9:13-24, 16:1-13 (DOC Assistant Executive Director of External Operations Andrews told SORT members that the disbandment of SORT was political).) In essence, Defendants now ask the court to disregard the jury's findings about the credibility and weight of the parties' evidence. The court declines. While arguably limited and imperfect, the evidence at trial here was sufficient for a reasonable jury to conclude that impermissible political motivations undergirded the statements Plaintiffs described hearing about their support for Remus from County employees and the decision to disband SORT.

## C. Evidence of Alternative Causes for SORT's Disbandment

Defendants argue that, even if Plaintiffs established a *prima facie* case, the verdict must be overturned because SORT would have been disbanded regardless of any retaliation against Plaintiffs for their political affiliation with Remus. *See Greene*, 660 F.3d at 979 (citing *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977) (burden-shifting analysis)). As support, Defendants cite *Brown v. Cnty. of Cook*, where the Seventh Circuit considered a claim

brought by a Sheriff's sergeant that Cook County failed to promote him because of his political affiliation. In *Brown*, the Seventh Circuit upheld summary judgment for the defendant because the plaintiff failed to provide adequate evidence that he was denied promotion because of his political affiliation. The Seventh Circuit noted, however, that even if the plaintiff had met his initial burden, the defendant could have prevailed by showing that the plaintiff "would have been denied promotion [anyway] for some other reason . . . [so] his political affiliation had no causal significance." (Defs.' Mot. at 3, citing 661 F.3d 333, 335 (7th Cir. 2011).) Here, too, Defendants urge, any political motivations had no causal significance because there were sufficient "nonpolitical ground[s]" for disbanding SORT. (Defs.' Mot. at 8-9, citing *Brown*, 661 F.3d at 337 ("*[A]ny* nonpolitical ground that the defendant can prove would have caused the discrimination regardless of the presence of political hostility will preclude liability.") (emphasis in original).)

Defendants insist that Godinez's authority as Executive Director to reverse any disbandment plan and his testimony that he was not influenced by Plaintiffs' political activities shows that SORT would have been disbanded regardless of Plaintiffs' support for Remus. (Defs.' Mot. at 8-9.) According to Defendants, Godinez, who testified he was unaware of Plaintiffs' political inclinations, was the true decision-maker because, as Executive Director, he "could have stopped the process of disbanding SORT, but did not." (*Id.* at 9.) As Defendants interpret the evidence, Plaintiffs did not rebut Godinez's testimony that he made an independent decision to disband SORT that was not based on Kurtovich's retaliatory suggestions. (Kurtovich's Supp. at 1; Defs.' Reply at 2-6, Defs.' Mot. at 8.) Defendants emphasize Godinez's trial testimony that he disbanded SORT because of "efficiency and safety" concerns and that he "never saw SORT team members doing much of anything." (Kurtovich's Supp. at 6.) Defendants argue, in short, that they should prevail on their motion because Godinez was not aware of Plaintiffs' political loyalties and disbanded SORT for valid reasons unrelated to Plaintiffs' First Amendment activities.

The court disagrees. In arguing that Godinez was unaware of Plaintiffs' political loyalties

and disbanded SORT for valid non-political reasons, Defendants merely re-state evidence considered by the jury and contend that no reasonable jury could have rejected that evidence. But Plaintiffs were not required to rebut Godinez's testimony in order for the jury to find in their favor. Neither party is entitled to judgment as a matter of law when a case turns on credibility. *Payne v. Milwaukee Cnty.*, 146 F.3d 430, 433 (7th Cir. 1998) ("When a case turns on credibility, neither side is entitled to judgment as a matter of law unless objective evidence shows that it would be unreasonable to believe a critical witness for one side.") (citations and internal quotation marks omitted). In this case, the jurors certainly understood that valid independent reasons for disbanding SORT would defeat Plaintiffs' case: they expressed their discomfort with that principle in a note during their deliberations.[6] Defendants did not convince the jury that SORT would have been disbanded regardless of any political affiliation retaliation, and Plaintiffs were not required to rebut each piece of evidence offered by Defendants in order to prevail.

To the contrary, the jury was free to discredit Godinez's testimony even if that testimony had been uncontested. *See, e.g., Kasper v. Saint Mary of Nazareth Hosp.*, 135 F.3d 1170, 1173 (7th Cir. 1998) (jurors are not compelled to credit even uncontroverted testimony); *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994) (a jury has the prerogative "to disbelieve uncontradicted testimony unless other evidence shows that the testimony must be true"). Given the jury's verdict, it is not "pure speculation," as Defendants claim, to conclude that the jury chose not to believe all of Godinez's testimony. (Cnty.'s Reply to Pls.' Resp. at 6.) Defendants argue that this case is like *Passananti v. Cook Cnty.*, where there was "simply no evidence" to support the plaintiff's claims that her position was eliminated because of gender discrimination. 689 F.3d 655, 675 (7th Cir.

---

[6]    As described earlier, the instructions told the jurors: "If you find that the Defendants would have disbanded [SORT] even in the absence of Plaintiffs' political support or perceived political support for Richard Remus, then your verdict should be for Defendants." Jury Instructions [191], at 20. In their note, the jurors observed that the instructions appeared to permit the "guilty individual(s) . . . to politically discriminate at will so long as SORT would have been disbanded anyway." 8/30/12 Jury Note [192-1].

2012). In this case, in contrast, the process Defendants used to disband SORT was largely unexplained—Defendants offered no evidence of any meetings, discussions, formal plans, or even post-hoc documentation of their decision—and Plaintiffs presented testimonial evidence of possible retaliatory intent. *See Lust v. Sealy, Inc.*, 383 F.3d 580, 583 (7th Cir. 2004) (affirming that if a plaintiff in a discrimination suit offers evidence, the jury is free to disbelieve the defendant's contrary evidence).

Kurtovich also contends that there is no causal connection between his own conduct and the disbandment of SORT because "[t]he appointment of Godinez to take over for Kurtovich severed the causal link because [disbanding SORT] was Godinez's decision alone to implement." (Kurtovich's Supp. at 5.) Kurtovich urges that harm to Plaintiffs from SORT's disbandment was only possible after "someone other than . . . Kurtovich made an independent assessment and enacted the recommendation [to disband SORT]." (Def. Kurtovich's Reply In Support of the Rule 50(b) Mot. [278], hereinafter "Kurtovich's Reply", at 3.) Again, the court disagrees. First, as noted earlier, Godinez testified at his deposition that the decision was made prior to his tenure, and he merely carried it out. Even if the jury credited his trial testimony that he did make the decision, the jury could reasonably have concluded that Kurtovich's encouragement contributed to SORT's demise. *See, e.g. Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 381 (7th Cir. 2011) (citing "cat's paw" theory of liability). In any event, the fact that the allegedly unbiased Godinez possessed the authority to alter or reverse the plan to disband SORT does not require the conclusion that Defendants are absolved of liability. If unconstitutionally-conceived plans could be corrected by simply bringing in a neutral supervisor to implement them, then constitutional protections would be spineless. The jury could well have concluded that even if Godinez had the authority to reverse or modify the disbandment plan, SORT would not have been disbanded absent a political motivation.

For similar reasons, the court is not moved by Defendants' interpretation of the jury's

August 30, 2012 note.  As Defendants interpret the message, the jury's request for confirmation that Defendants would not be liable for retaliation if SORT would have been disbanded anyway shows that the jury "understood the law with respect to the First Amendment claim . . . [but] chose to ignore the law and the instruction by the Court."  (Cnty.'s Reply to Pls.' Resp. at 9.)  According to Defendants, the jury's verdicts in favor of Godinez but against Kurtovich and the Sheriff's Office are in "obvious conflict" with each other and therefore "cannot stand."  (Defs.' Mot. at 14.)  Plaintiffs presented evidence that the plan to disband SORT was originally Kurtovich's idea, however; a reasonable juror could decide that Godinez's execution of the disbandment plan was not enough to subject him to liability, but that Kurtovich's actions were sufficient to impose liability on him as well as the County.  *See Lust v. Sealy, Inc.*, 277 F. Supp. 2d 973, 979 (W.D. Wis. 2003) *aff'd as modified* 383 F.3d 580 (7th Cir. 2004) ("If a reasonable view of the evidence—not necessarily the most reasonable—supports the jury's findings, a Rule 50(b) motion must be denied.").

The County is liable under section 1983, just as Kurtovich is individually, because the jury found that the County made an official decision to disband SORT in retaliation against Plaintiffs.  *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36 (1978) ("Local governing bodies" can be held liable for unconstitutional actions that implement "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); *Owen v. City of Independence*, 445 U.S. 622, 657, 100 S. Ct. 1398, 1418 (1980) (municipalities are not immune from liability for damages flowing from constitutional violations under section 1983).  The court therefore will not set aside the jury's liability findings against Defendants.[7]

---

[7]     Since the court rejects Defendants' request to set aside the jury's liability finding, it does not respond to Plaintiffs' contention that Defendants waived their argument that Godinez's decision-making was an independent cause of SORT's disbandment or that the burden-shifting analysis for retaliation cases is irrelevant after trial.  (Pls.' Resp. at 2.)

## II.  Punitive Damages Against Kurtovich

As noted, the jury awarded more than $200,000 in punitive damages against Defendant Kurtovich individually.  Punitive damages are appropriate when a defendant acted wantonly and willfully or was motivated by ill-will or a desire to injure.  *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009) (citations and internal quotation marks omitted).  Kurtovich argues that the court should vacate the jury's award of punitive damages  because his actions do not meet this standard. Alternatively, he argues that Plaintiffs have not proved that his actions meet the standard for punitive damages in regard to each individual Plaintiff. In assessing these challenges, the court addresses, first, the propriety of an award of punitive damages in this case and, second, the size of the award.

### A.  Appropriateness of Punitive Damages

Defendants first argue that Kurtovich is not liable for punitive damages because SORT was disbanded by Godinez, not Kurtovich.  (Kurtovich's Supp. at 7.)  Because he did not make the ultimate decision to disband SORT, Kurtovich urges, he did not have the requisite involvement for punitive damages.  (Kurtovich's Reply at 4.)  This argument effectively repeats Defendants' challenge to the verdict itself, a challenge the court has already addressed.  As explained earlier, though Godinez was in charge when the decision was implemented, the jury was entitled to find that Kurtovich acted willfully when he suggested, as the interim Executive Director, that SORT be disbanded.  At a minimum, if Kurtovich did not make the final decision to disband SORT, there was evidence at trial that he facilitated or encouraged it.  (Pls.' Resp. to Defs.' Supplemental Rule 50(b) Mots. [260], hereinafter "Pls.' 2d Resp.", at 11.)  In light of the paucity of evidence about how and by whom the decision to disband SORT was made, a rational jury could conclude that Kurtovich played enough of a role in the decision to disband SORT for political reasons to support an award for punitive damages.

Defendants next argue that there was insufficient evidence that Kurtovich's actions were wanton or willful. (Defs.' Mot. at 14.) Punitive damages are appropriate only when "the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23, 123 S. Ct. 1513, 1523 (2003) (noting punitive damages to punish or deter conduct bearing no relation to plaintiffs' harm are invalid; punitive damages are not warranted merely for "being an unsavory individual or business"). A jury may award punitive damages in a section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Alexander v. City of Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007). Plaintiffs contend that Kurtovich met the punitive damages standard because he knew it was unlawful to retaliate against Plaintiffs for their political activities, yet did so anyway. (Pls.' Resp. at 14.)

As evidence, Plaintiffs cite Plaintiff Castellano's testimony that Kurtovich said he didn't "care if they [SORT members] sue me." (Pls.' 2d Resp. at 10.) The court notes that this comment was made during a conversation at the command post in 2004 in reference to Kurtovich's refusal to reimburse SORT members for missing previously scheduled vacations, not to the disbandment of SORT in 2006. Trial Tr. 8/22/12 1730:8-14. As additional evidence of unlawful intent, Plaintiffs point to their testimony that other command staff told them that Kurtovich intended to "get rid of all things Remus." (Pls.' 2d Resp. at 10.) The evidence of Kurtovich's specific intent was limited, but the same evidence that supports the jury's verdict is sufficient for a finding that Kurtovich knowingly violated the law by encouraging the disbandment of SORT in retaliation for Plaintiffs' support of Remus.

As Defendants correctly point out, however, there was little evidence of actual harm to any of the Plaintiffs as a result of the actions of Kurtovich or the County.[8] Plaintiffs did not lose their

---

[8]     Defendants have not challenged the jury's award of compensatory damages, despite
(continued...)

jobs or suffer any demotion or loss in base pay. (Defs.' Mot. at 14.) Kurtovich urges that punitive

damages "should not be awarded because of perceived slights or a plaintiff's self imposed [sic]

sense of persecution." (Kurtovich's Reply at 4.) Punitive damages are aimed at the conduct of a

Defendant, however, not merely the losses suffered by Plaintiffs. A jury can award punitive

damages "to further a State's legitimate interests in punishing unlawful conduct and deterring its

repetition." *BMW of N. Am., Inc. v Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 1595 (1996);

*Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 567 (7th Cir. 2006) (punitive damages may

be used to dissuade defendants who are unaffected by compensatory damages from the

misapprehension that they are beyond the reach of civil penalties).

Here, Plaintiffs urge, punitive damages are warranted to deter political retaliation by

Kurtovich in the future. (Pls.' Resp. at 15; Pls.' 2d Resp. at 10.) Plaintiffs contend there is a risk

of such misconduct because Kurtovich still possesses "power to have them disciplined,

investigated, harassed, and to make sure that they never advance beyond picking up trash,

passing out bologna sandwiches, and washing inmates underwear." (Pls.' Resp. at 14.) The court

does not share Plaintiffs' apparent belief that an award of punitive damages will (or should)

influence work assignments in the manner Plaintiffs suggest; some of the responsibilities Plaintiffs

disparage are the very jobs for which Plaintiffs, who remain employed as Cook County Correctional

---

[8](...continued)
the fact that this case appears to be a good candidate for remittitur. Courts review compensatory
damages awards to examine whether (1) they are monstrously excessive; (2) there is no rational
connection between the award and the evidence; and (3) the award is roughly comparable to
awards made in similar cases. *Schandelmeier-Bartels*, 634 F.3d at 388 (reducing excessive jury
award in Title VII case). Cases involving significant emotional distress damages for lost work
responsibilities often hinge on the credibility of the plaintiffs. *See, e.g., Delougherry v. City of
Chicago*, 422 F.3d 611, 620 (7th Cir. 2005) (affirming award of significant compensatory damages
for mental and emotional suffering to a police lieutenant who was denied a promotion in retaliation
for filing discrimination complaints because of the district court's assessment of her demeanor).
After observing the Plaintiffs during trial, this court has grave doubt that their altered work
responsibilities justify awards reaching as much as $350,000 for a single Plaintiff and more than
a million dollars in total compensatory damages. As Defendants have not asked for remittitur,
however, the court need not address the matter further.

Officers, were hired and are being paid. Without endorsing Plaintiffs' hyperbolic assertions, the court observes simply that a rational jury could conclude that targeted retaliation against Plaintiffs for their political activity warranted punitive damages and that Kurtovich would be deterred by having to pay punitive damages in his individual capacity. The court will not set aside the jury's decision to award punitive damages against Kurtovich.

Kurtovich also argues that punitive damages should not be awarded against him because "[u]nder the instructions used by the jury, every individual defendant should have been liable for punitive damages." (Kurtovich's Reply at 4.) Once again, the court disagrees. The jury found in favor of all of the other individual Defendants on liability. Moreover, whether or not the Defendants and the court are convinced by the evidence, enough was provided for a reasonable juror to find that Kurtovich acted with a disregard for Plaintiffs' rights not shared by the other individual Defendants. Testimony at trial identified Kurtovich as a leader in the effort to retaliate against Plaintiffs for their support for Remus in a way that distinguishes him from the other individually named Defendants.

Finally, Kurtovich argues that Plaintiffs did not present evidence of Kurtovich's mental state as to each individual Plaintiff. (Kurtovich's Reply at 5.) This argument plainly fails. Plaintiffs provided evidence that Kurtovich contributed to disbanding SORT, a single decision which harmed each of the Plaintiffs individually. Defendants did not move to sever the cases, and both parties litigated the case as a challenge to a single decision—to disband SORT—rather than a series of decisions that affected the Plaintiffs individually. By convincing the jury that Kurtovich acted in callous disregard of Plaintiffs' rights, Plaintiffs proved that each Plaintiff was entitled to punitive damages as a member of SORT who was harmed by the decision.

## B. Amount

The jury has primary responsibility for determining an appropriate punitive damages award, but courts have a duty to review awards to make sure that they are not unjustly arbitrary. *See*

*Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994) (emphasizing the importance of judicial review in preventing unjust punitive awards that violate the Due Process Clause). In assessing the reasonableness of a punitive damages award and deciding whether it violates due process, courts weigh (1) the reprehensibility of defendants' conduct; (2) the disparity between the harm suffered by the plaintiff and the award; and (3) penalties authorized in comparable cases. *State Farm*, 538 U.S. at 418. The first prong of this test—the reprehensibility of the defendant's conduct—is the most important factor for assessing the reasonableness of a punitive damages award, and under it courts consider whether the harm caused was physical or economic; whether the target of the conduct was financially vulnerable; whether conduct was repeated or an isolated incident; whether the tortious conduct showed indifference to or reckless disregard of the health or safety of others; and whether the harm resulted from intentional malice, trickery, or deceit, rather than accident. *Id.* at 419.

In this case, the harm caused by Kurtovich was not physical, nor were Plaintiffs financially vulnerable. Plaintiffs' complaints about Kurtovich focused largely on the decision to disband SORT, and a handful of other alleged personnel actions, none of which appeared to impinge on the health or safety of others in any direct way. Plaintiffs did provide evidence that Kurtovich acted out of malice, but the reprehensibility of Kurtovich's conduct provides little support for a punitive damages award of $210,000.

Looking to the second prong of the punitive damages test—the disparity between the harm suffered and the award—Plaintiffs contend that "Kurtovich's actions in disbanding the SORT unit . . . destroyed Plaintiff's lives, careers, family relationships, and futures" because they lost their special status as SORT members. (Pls.' Resp. at 14.) They urge that the $210,000 in punitive damages awarded against Kurtovich are therefore justified. (*Id.* at 9.) The court disagrees. Plaintiffs lost no pay or employment benefits. They suffered no loss beyond a change in daily job responsibilities—a change that arguably did nothing more harmful than returning an

otherwise-exalted set of officers to the rank and file. Awarding $10,000 per Plaintiff for Kurtovich's suggestion that Plaintiffs should suffer the indignity of having to perform general correctional officer work rather than only "elite" tasks appears excessive. Whatever Plaintiffs may subjectively believe, they did not establish that changes in their duties and a loss of the so-called "band of brothers" *esprit de corps* were solely responsible for the reported loss of self-esteem or shattered personal relationships described in their trial testimony.[9]

An award of $210,000 could also impair marginal deterrence. As the Seventh Circuit reasoned in *Lust v. Sealy*, if a defendant must pay extensive punitive damages for a relatively minor discriminatory act then he "has no monetary disincentive . . . to escalate minor into major discrimination." 383 F.3d at 591 (reducing punitive damages award in sex discrimination case where plaintiff was denied a promotion for a mere two months).[10] Finally, the court notes that punitive damages are to be evaluated from the vantage point of the defendant, not that of the plaintiffs. In the end, the court is unwilling to reinforce Plaintiffs' unreasonable investment in their status as SORT officers through an excessive punitive damages award. An award of $10,000 is enough to sufficiently penalize Kurtovich—a public employee—for his role in disbanding SORT. The court therefore adjusts the punitive damages award downward to $10,000.

## III.  Standing and Judicial Estoppel

The Bankruptcy Code requires debtors to file a list of all assets and liabilities, including

---

[9]     Nor is the court fully convinced that the loss of the "band of brothers" mentality among SORT members was wholly negative: Plaintiffs' own testimony suggested that the team ethos of SORT was not healthy for the work of correctional officers hoping to engender cooperation from inmates.

[10]     For several reasons—including staffing shortages—maintaining a unit devoted solely to elite tasks may well have been an abuse of County resources. Godinez testified about several problems with SORT, though Defendants provided no contemporaneous evidence that any of those concerns were the actual impetus behind the disbandment decision. The many good reasons why Defendants might have disbanded SORT are not cause enough to overturn the jury's verdict, but they are reasons why, on the merits, disbanding SORT may well have been an appropriate course.

pending causes of action, along with a statement of financial affairs. *See* 11 U.S.C. §§ 521, 541(a)(1). Defendants contend that six Plaintiffs—Javier Rueda, Nelson Lewis, John Nawara, Samuel Diaz, Glenn Ross, and Matt Vlahos (hereinafter "Bankruptcy Plaintiffs")—should be barred from benefitting from their claims because they failed to disclose their interests in this case as assets in bankruptcy filings.[11] Defendants ask the court to take judicial notice of these bankruptcy filings (Cnty.'s Supp. at 3, citing *In re Consol Indus. Corp.*, 397 F.3d 524, 527 (7th Cir. 2005)), and argue that the Bankruptcy Plaintiffs' failure to disclose their interests in this litigation means that they lack standing or, alternatively, are judicially estopped from benefitting from the verdict. (Kurtovich's Supp. at 7-8; Defs.' Mot. to Join and Supplement Def. Kurtovich's Rule 50(b) Mot. [246], hereinafter "Cnty.'s Supp.", at 2-3; Defs.' Resp. to Mots. to Join Trustees as Pls. [253], hereinafter "Defs.' Resp. to Mots. to Join Trs.", at 2.)[12]

## A. Procedural History of Bankruptcy Filings

Plaintiffs initiated this lawsuit on November 18, 2008. (Compl. [1].) Four of the six Bankruptcy Plaintiffs—Nawara, Ross, Rueda, and Vlahos—subsequently filed for bankruptcy but did not schedule their interests in this case as assets. (Kurtovich's Supp. at 9; Defs.' Resp. To Mots. to Join Trs. at 2-3.) One of the Bankruptcy Plaintiffs, Lewis, had already filed for bankruptcy when this lawsuit was initiated. He did not subsequently schedule his interest in this case during the period between

---

[11] Rueda's case is No. 07-2187 and No. 09-00839. Lewis's bankruptcy case is No. 07-10266. Nawara's bankruptcy case is No. 10-02331. Diaz's bankruptcy case is No. 12-37134. Ross's bankruptcy case is No. 09-5421. Vlahos's bankruptcy case is No. 09-28169.

[12] Plaintiffs argue that Defendants' bankruptcy arguments are waived because Defendants did not raise them in their Rule 50(a) motion. (Pls.' 2d Resp. at 12-13.) Defendants' bankruptcy-related arguments are not a direct challenge to the verdict, however, so the law on waiver as it relates to Rule 50 does not apply. Even if that law were relevant, Defendants did not forfeit their challenge to the Bankruptcy Plaintiffs' failure to disclose their interests because they were not aware of that failure until several months after the trial. Defendants did question Plaintiff Vlahos about his bankruptcy during trial, but they raised that issue only in the sense that they tried to establish that nothing about their conduct was responsible for his bankruptcy. (Defs.' Resp. to Mots. to Join Trs. at 3-4.)

when this lawsuit was filed and when he was granted a discharge ten months later. (Kurtovich's Supp. at 9.) The final Bankruptcy Plaintiff, Diaz, filed for bankruptcy after Plaintiffs initiated this lawsuit and disclosed his interest in the suit, but he valued that interest at just $5,000. (Defs.' Reply Mem. in Supp. of its Supplemental Rule 50(b) Mot. [279], hereinafter "Defs.' 2d Reply", at 10-11.)

Ross and Vlahos sought bankruptcy protection under Chapter 7 of the Code; the other four Bankruptcy Plaintiffs filed under Chapter 13. (Defs.' 2d Reply at 10-11; Defs.' Resp. to Mots. to Join Trs. at 2.) Vlahos's bankruptcy case concluded when he received a discharge in November 2009, but he filed a motion to reopen his bankruptcy in August 2012, three days before the trial in this case began. (Defs.' Resp. to Mots. to Join Trs. at 3.) Vlahos submitted amended schedules to the bankruptcy court disclosing his interest in this suit on August 27, 2012, six days after being questioned at trial about his bankruptcy. (*Id.* at 4.)

Rueda's and Nawara's bankruptcy cases were dismissed in 2009 and 2010. (Defs.' 2d Reply at 10-11.) By early February 2013, several months after trial, Defendants became aware of the bankruptcy proceedings of Diaz, Rueda, Nawara, Ross, and Lewis and brought them to the attention of Plaintiffs' counsel. Diaz filed amended schedules in bankruptcy court to disclose the verdict in this suit on February 6, 2013. (Kurtovich's Supp. at 9.) On February 7, 2013, Defendant Kurtovich submitted a supplemental memorandum in which he made a judicial estoppel argument. The following day, Rueda moved to reopen his case to file amended disclosures. Nawara also filed a motion to reopen his case on February 27, 2013. That motion was denied, but Nawara nevertheless filed amended schedules on March 11, 2013. *See In re Nawara*, No. 10-02331 (Bankr. N.D. Ill. March 11, 2013). Ross's Chapter 7 bankruptcy case was concluded on June 1, 2009, but was reopened during the trial on August 14, 2012, and he filed an amended disclosure on February 11, 2013. (Cnty.'s Supp. at 3.) Lewis's bankruptcy case was concluded on September 17, 2009, but he moved to reopen it on February 8, 2013. (*Id.*) All of the Bankruptcy Plaintiffs have therefore attempted in some fashion to remedy their earlier failures to accurately

disclose their interests in this case as assets.

**B.      Standing of Plaintiffs Ross and Vlahos**

Plaintiff Glenn Ross filed for bankruptcy before this lawsuit began and received a discharge under Chapter 7 seven months after the suit was filed.  Because he did not disclose his interest in the suit prior to receiving his discharge, Defendants contend he lost standing to recover anything in this case.  (Cnty.'s Supp. at 9-10.)  Plaintiff Matt Vlahos also received a discharge under Chapter 7 while this suit was pending and before he disclosed his interest in it as an asset, though unlike Ross he did not file for bankruptcy until eight months after this suit was filed.  (Defs.' Resp. to Mots. to Join Trs. at 2-3.)  Defendants contend that Vlahos also lacks standing to recover anything here because he failed to timely disclose his interest in this suit.  (*Id.* at 6.)

A Chapter 7 bankruptcy debtor's property becomes the property of a bankruptcy estate, and only a Trustee of the estate has standing to pursue claims on the estate's behalf.  *Matthews v. Potter*, 316 F. App'x. 518, 521 (7th Cir. 2009) ("[I]f a legal claim is not scheduled . . . by the time the bankruptcy is closed, it forever remains the property of the estate, and the trustee remains the real party in interest.") Ross's and Vlahos's claims in this case belong to their bankruptcy estates, Defendants urge, and must now be dismissed because both men failed to list the claims as part of those estates.  (Cnty.'s Supp. at 9-10, citing *Kunica v. St. Jean Financial, Inc.*, 233 B.R. 46, 53 (S.D.N.Y. 1999) (unscheduled claims must be dismissed because debtor lacks standing to bring them even after emerging from bankruptcy); Defs.' Resp. to Mots. to Join Trs. at 6.)  Dismissal of Ross's and Vlahos's claims is required, Defendants argue, because standing is a matter that may be raised at any time during litigation.

As Plaintiffs observe, however, Defendants' challenge is better understood as directed at Plaintiffs' status as the real party in interest.  (Pls.' 2d Resp. at 13, citing *Tate v. Snap-On Tools Corp.*, No. 90 C 4436, 1997 WL 106275, *4 (N.D. Ill. Feb. 11, 1997) ("[S]tanding turns on whether the plaintiff can show an injury . . . traceable to the . . . defendant and likely to be redressed by the

relief sought [while] designation of the real party in interest . . . identif[ies] the person who possesses the particular right sought to be enforced [and] . . . protect[s] the defendant against a subsequent action by the party actually entitled to recover.") (citations and internal quotation marks omitted).)  The distinction is significant because, unlike standing, challenges to whether a plaintiff is a real party in interest are not jurisdictional.  *RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010).  Although Ross and Vlahos lost their direct interests in the outcome of this lawsuit through bankruptcy, that process did not change the fact that Defendants injured them.  *See Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008) (distinguishing standing from real party in interest requirement), *Inghram v. Taskin, Inc.*, No. 07-3056, 2008 WL 295078, *2 (C.D. Ill. Jan. 31, 2008) (discussing real party in interest requirement in bankruptcy case).  On February 8, 2013, the Trustee in Ross's bankruptcy moved for appointment of Plaintiffs' counsel in this action as special counsel in Ross's bankruptcy proceeding, and Ross moved to substitute his bankruptcy Trustee [242], the real party in interest, in this suit on February 13, 2013.  That same day, Vlahos similarly moved to join his bankruptcy Trustee in this suit [243].  Ross and Vlahos are no longer the real parties in interest in this case and will not benefit directly, but this does not require dismissal of their claims.[13]

### C.     Judicial Estoppel

The doctrine of judicial estoppel bars parties in litigation from taking positions that contradict positions they successfully took in earlier proceedings. *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005).  Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New*

---

[13]     Plaintiff Ross has argued that an order dismissing the jury's award to him would be void because his claim is the property of an estate over which a Chapter 7 Trustee has exclusive authority and which is protected by an automatic stay. (Pls.' 2d Resp. at 14.)  As Ross himself initially failed to disclose his claim to the Trustee, this argument appears disingenuous, but in light of the disposition outlined in text, the court need not address it further.

*Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citations and internal quotation marks omitted).

Enforcement of the doctrine of judicial estoppel is within the court's discretion. *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012). Defendants invoke this doctrine, reasoning that the Bankruptcy Plaintiffs benefitted by failing to disclose this lawsuit and should be estopped now from recovering on the verdict. The court addresses this argument first with respect to Plaintiff Diaz, who did initially disclose his interest in this case, and then with respect to the remaining Bankruptcy Plaintiffs, who did not.

### 1. Plaintiff Diaz

Defendants admit that Diaz disclosed his interest in this suit in his initial bankruptcy petition on September 2, 2010, but note that he estimated the value of his interest in the case at only $5,000 (Defs.' 2d Reply at 10-11)—far less than the verdict for him of $25,000 in compensatory damages and $10,000 in punitive damages. (Minute Entry 9/4/12 [189].) Defendants contend that Diaz should be judicially estopped from recovering on this verdict because he did not attempt to amend his bankruptcy petition to reflect the actual value of his legal claim until he was confronted by counsel for Defendants. (Defs.' 2d Reply at 10-11.) Defendants offer no authority for this argument, however. Diaz's failure to better predict the value of his claim is not grounds for judicial estoppel, as litigants can hardly be required to accurately estimate their ultimate recovery. *Cf. In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 429-30 (7th Cir. 2007) ("Litigation outcomes are uncertain, not reducible to mathematical formulas."). Indeed, Diaz's modest estimate of the value of his claim is not at all surprising to the court, in light of the fact that he (like the other Plaintiffs) did not prove any out-of-pocket economic harm from the disbandment of SORT. And, given the pendency of Defendants' own post-trial motions, the court declines to adopt their theory that Diaz could avoid judicial estoppel only by submitting amended bankruptcy filings immediately after the verdict was returned. Defendants' judicial estoppel objection to Diaz's recovery is overruled.

26

### 2.    Plaintiffs Rueda, Lewis, Nawara, Ross, and Vlahos

Defendants contend that the remaining Bankruptcy Plaintiffs are judicially estopped from pursuing their claims because their original bankruptcy filings made no mention of these claims at all. (Kurtovich's Supp. at 10, citing *Cannon-Stokes v. Potter*, 453 F.3d 446, 448-49 (7th Cir. 2006) ("[A] debtor in bankruptcy who denies owning an asset . . . cannot realize on that concealed asset after the bankruptcy ends."); Defs. Resp. to Mots. to Join Trs. at 7-9.) Defendants acknowledge that Vlahos reopened his bankruptcy case to submit amended schedules in August 2012 and Rueda, Lewis, Nawara, and Ross attempted to reopen their bankruptcy cases in February 2013 in order to list their interests in this case as assets. This is not enough to defeat judicial estoppel, however, Defendants insist, because allowing parties who have deceived the court to amend their filings without penalty "would diminish the incentive to provide truthful disclosures." (Cnty.'s Supp. at 5, citing *Esparza v. Costco Wholesale Corp.*, No. 10 CV 5406, 2011 WL 6820022, *4 (N.D. Ill. Dec. 28, 2011).)

Defendants acknowledge, further, that only Plaintiffs Lewis and Vlahos received a discharge in bankruptcy, but nevertheless argue that all of the remaining Bankruptcy Plaintiffs are estopped from benefitting from the verdict in this case. Defendants urge that a debtor can be subject to judicial estoppel if he received significant financial benefits during bankruptcy proceedings, such as the automatic stay that holds creditors at bay. (Cnty.'s Supp. at 6, citing *Williams v. Hainje*, 375 F. App'x 625, 626 (7th Cir. 2010) (automatic stay and reorganization plan that temporarily relieved plaintiff of most of his debts were benefits barring him from proceeding on a civil rights claim that arose pre-petition); *see also Carnegie v. Household Int'l*, 376 F.3d 656, 660 (7th Cir. 2004) (judicial estoppel applies where party received temporary benefit of an approved class settlement).) Kurtovich similarly argues that he was prejudiced by not being able to challenge the credibility of Plaintiffs at trial based on the Bankruptcy Plaintiffs' "concealment of the claims in this case" in bankruptcy. (Kurtovich's Reply at 10.) He speculates that the jury would have

awarded lesser damages had they known that Plaintiffs "placed no value on their claims." (*Id.*)

Plaintiffs offer several responses to these arguments. They suggest, first, that they did not actually fail to disclose their interests in this lawsuit during bankruptcy because in each of the Bankruptcy Plaintiffs' cases "the Trustee was and/or is on notice of the claim." (Pls.' 2d Resp. at 16-17, citing *Matthews v. Potter*, 316 F. App'x 512, 522 (7th Cir. 2009).) As noted, after Defendants raised the issue, Ross and Vlahos each filed a motion to join their bankruptcy Trustees as the real party in interest in this case [242 and 243] on February 13, 2013. In his motion, Vlahos claimed, without detail, that he disclosed this suit as an asset at his Creditors' meeting. (Pls.' Mot. to Join Trustee of Pl. Vlahos's Chapter 7 Estate [243], at ¶ 2.) Two weeks after filing a motion to join his bankruptcy Trustee, Ross also declared that he "believe[s]" that he informed the Trustee of his interest (he does not say how) at his Creditors' meeting. (Ross Decl. [260-1] at 38.) Nawara similarly declared on March 1, 2013, without detail, that he had disclosed his interest at his Creditors' meeting. (Nawara Decl. [260-1] at 34.) (Plaintiffs Lewis and Rueda do not claim to have disclosed their interests in this case.)

Defendants are skeptical of these claims, and point out that they have not had "the opportunity to test" the Plaintiffs' declarations that they disclosed their interests in this case during Creditors' meetings. (Kurtovich's Reply at 10.) Defendants note that Plaintiffs' claims that the Trustees were on notice of the Bankruptcy Plaintiffs' interest in this suit are supported by nothing more than the Bankruptcy Plaintiffs' declarations. (*Id.*) Even if those declarations are accurate, Defendants argue, informal verbal disclosures in Creditors' meetings are not adequate because bankruptcy schedules must be signed by the debtor under penalty of perjury. (Defs.' 2d Reply at 10.) The court agrees. The Bankruptcy Plaintiffs did not properly disclose their interests in this case in their bankruptcy filings, and there is insufficient evidence that their interests were made clear enough to put the Trustees on notice of their claims. The fact that some of the Plaintiffs may have informally told their Trustees about their interests in this case does not change things.

Plaintiffs next urge that their failure to properly list their interests in this case was inadvertent, and that judicial estoppel is inappropriate when a party's inconsistent positions are the result of mistake. The Bankruptcy Plaintiffs maintain that they have worked to correct the errors in their bankruptcy schedules, and that those errors were oversights, not deceptions. (Pls.' 2d Resp. at 16-17.) Plaintiffs cite *Fairchild v. Touchtunes Music Corp.*, where the court permitted discovery on the question of plaintiff's intent in failing to disclose his employment discrimination claim, observing that the judicial estoppel doctrine is aimed at "cold manipulation and not [at] an unthinking or confused blunder." No. 01 C 9699, 2002 WL 31833768, *2 (N.D. Ill. Dec. 12, 2002).

Defendants challenge Plaintiffs' assertion that their failures to disclose their interests in this case were inadvertent; in any event, Defendants argue, even an apparently innocent mistake is not a defense to Plaintiffs' failure to list a pending claim in bankruptcy. (Kurtovich's Supp. at 10.) There is case law on both sides of that argument. *See Hawkins v. Securitas Sec. Svcs.*, No. 09 C 3633, 2011 WL 2837269, *1 (N.D. Ill. July 18, 2011) (plaintiff who received Chapter 7 discharge after filing suit barred from pursing a fair pay claim even though she had reopened her bankruptcy and claimed her failure to schedule the claim was an innocent mistake); *Becker v. Verizon N., Inc.*, No. 06-2956, slip op., 2007 WL 1224039, *1 (7th Cir. Apr. 25, 2007) ("Becker intimates that her failure to disclose this lawsuit in her sworn financial statement was unintentional, but her subjective intent does not" prevent judicial estoppel.); *but see Rainey v. United Parcel Serv.*, 466 F. App'x 542, 545 (7th Cir. 2012) (no judicial estoppel when plaintiff re-opens bankruptcy case to disclose inadvertently undisclosed interest); *Fairchild*, 2002 WL 31833768, *2 (permitting discovery on the issue of plaintiff's intent).) In this case, the notion that Plaintiffs' omissions were inadvertent or mistaken is not compelling. Plaintiffs testified that the injuries for which they seek a remedy in this case were extensive and profound; they were actively litigating this claim at the time of their filings; and they had sufficient motive to conceal the asset for their own gain.

Finally, Plaintiffs urge that dismissing their claims on judicial estoppel grounds would "work

an injustice" on Plaintiffs' creditors by denying the creditors an asset.  (Pls.' 2d Resp. at 15, 21.)

At least some case law favors this position.  *See, e.g., Rainey*, 466 F. App'x at 545 (vacating district

court's judgment on the pleadings against plaintiff because plaintiff failed to disclose suit during

Chapter 13 bankruptcy when, on appeal, plaintiff had reopened his bankruptcy case to disclose the

suit) ("[Barring plaintiff's claims would] undermine the interests of his creditors and defeat the

district court's intent that [he] be able to pursue the discrimination claims if he reopened his

bankruptcy.").)  In *Biesek v. Soo Line R. Co.*, the Seventh Circuit affirmed a district court's grant

of summary judgment against a plaintiff because he had not disclosed his on-the-job injury claim

in his Chapter 7 bankruptcy schedules and the claim no longer belonged to him.  The Seventh

Circuit noted, however, that judicial estoppel appears inappropriate when it would adversely affect

a plaintiff's innocent third-party creditors.  440 F.3d 410, 413 (7th Cir. 2006) ("Judicial estoppel is

an equitable doctrine, and using it to land another blow on the victims of bankruptcy fraud is not

an equitable application.").  Plaintiffs contend that they have reopened their bankruptcy cases in

an honest attempt to help pay off their debts to their creditors.  (Pls.' 2d Resp. at 21.)[14]

The Seventh Circuit has held that a debtor in bankruptcy who denies owning an asset

cannot herself realize on that concealed asset after the bankruptcy ends.  *Cannon-Stokes*,

453 F.3d at 448.  In *Cannon-Stokes*, the plaintiff (1) filed for Chapter 7 bankruptcy; (2) denied

having any valuable legal claims even though she was pursuing an administrative claim against her

employer; (3) obtained a discharge; (4) subsequently filed a civil suit against her employer; and

(5) "never tried to make the creditors whole."  453 F.3d at 449.  Apart from belated efforts to make

their creditors whole, the Bankruptcy Plaintiffs are in the same circumstances.  They similarly

---

[14]     Kurtovich responds that Plaintiffs fail to cite cases where a plaintiff attempted to "redo" bankruptcy filings after winning a favorable jury verdict, so "the fairness arguments raised by Plaintiffs are simply not applicable."  (Kurtovich's Reply at 7.)  The court does not agree that the timing of the verdict here defeats the fairness concern; the Bankruptcy Plaintiffs' efforts to "redo" their filings after winning substantial verdicts do promote fairness to the creditors at this stage.

submitted statements under oath about their financial affairs that excluded information about their interests in this suit, even though the suit was ongoing. By failing to list this suit as an asset, they negligently or willfully deceived the bankruptcy court about their potential recovery. Attributing responsibility for Plaintiffs' failure to list their interests in this case to bankruptcy counsel does not change the analysis. (Defs.' 2d Reply at 10, citing *Cannon-Stokes*, 453 F.3d at 449 ("[B]ad legal advice does not relieve the client of the consequences of her own acts.").)[15]

The court concludes that because Nawara, Ross, Rueda, Vlahos, and Lewis failed to disclose their interest in this suit during their bankruptcy proceedings, they personally may not benefit from the verdict in this case. Their interests in this suit now belong to their bankruptcy estates, so the most appropriate result is to permit those estates to intervene and seek recovery here. The court therefore sustains Defendants' judicial estoppel arguments against Plaintiffs Rueda, Lewis, Nawara, Ross, and Vlahos as individuals, but will entertain motions during the next 30 days from any of their bankruptcy Trustees who wish to intervene and seek relief. *See* FED. R. CIV. P. 17(a)(3) (allowing real parties in interest a "reasonable time" to ratify, join, or be substituted into an action), FED. R. CIV. P. 25(c) (noting a court's ability to move to substitute or join a transferee with the original party). Ross's and Vlahos's respective motions to join their bankruptcy Trustees as parties to this action [242, 243] are therefore granted.

## CONCLUSION

Defendants' motion [192] is granted in part and denied in part. The court overrules Defendant Kurtovich's qualified immunity defense and denies Defendants' request for judgment as a matter of law. The court denies Defendants' motion to vacate the jury's punitive damages

---

[15]     Kurtovich points out that Plaintiffs' counsel in this action has also previously dealt with this issue in another case. (Kurtovich's Reply at 6, citing *Lujano v. Town of Cicero*, No. 07 C 4822, 2012 WL 4499326, *4 (N.D. Ill. Sept. 28, 2012) ("Attorney Kurtz submitted her own affidavit, attesting that Lujano never informed her of the bankruptcy filing . . . ").)

award against Kurtovich, but reduces that award to $10,000. The court denies Defendants' motion as to judicial estoppel against Plaintiff Samuel Diaz, but grants it as to Plaintiffs Javier Rueda, Nelson Lewis, John Nawara, Glenn Ross, and Matt Vlahos to the extent that the court bars those Plaintiffs from benefitting from this suit themselves. The court grants Ross's and Vlahos's motions [242, 243] to join their bankruptcy Trustees and invites the bankruptcy Trustees of Rueda, Lewis, Nawara, Ross, and Vlahos to move to intervene and seek relief within the next 30 days. Plaintiffs' motion for clarification and objection to Defendants' petition for appointment of additional counsel [241] is stricken without prejudice as moot.

ENTER

Dated: July 15, 2013

_____
REBECCA R. PALLMEYER
United States District Judge